# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00659-CV

---

**Dale Steenrod, Appellant**

**v.**

**Cathlene Pidgeon, Appellee**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-005671, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Dale Steenrod (Father) appeals from the trial court's amended final divorce decree appointing him and Cathlene Pidgeon (Mother) joint managing conservators of their daughter (Daughter), who was ten at the time of the bench trial. Father takes issue with the decree's conservatorship and possession provisions and its property division. For the following reasons, we will affirm the divorce decree.

## BACKGROUND

Father filed an original petition in a suit affecting the parent–child relationship (SAPCR) in August 2019. He included in his petition a request for a temporary ex parte order to deny Mother access to Daughter, alleging that Mother had engaged in child neglect and supporting his request with an affidavit. Father also requested a temporary restraining order and permanent injunction preventing Mother from hiding Daughter from him and withdrawing her

from enrollment at school, school activities, or the care of any person caring for her. In his affidavit, Father averred that Mother "has been diagnosed by a psychiatrist at Austin Oaks Hospital and other institutions as schizophrenic with episodes of psychosis" and has "at times completely vanished from the home during the above mentioned episodes." He further averred that he had recently been informed by Rock Springs Hospital in Georgetown, Texas, that Mother was admitted there for inpatient mental-health treatment about a month prior, that Mother had since been released, and that he and Daughter had not heard from Mother since her admission. The trial court issued an ex parte temporary restraining order prohibiting Mother from withdrawing Daughter from school or hiding her from Father, which order remained in effect for about three weeks.

About the same time, Mother filed an original petition for divorce, alleging that she and Father ceased living together as spouses in July 2019.[1] Thereafter Father filed a plea in abatement, alleging that no marriage exists or has ever existed between him and Mother and that the parties merely resided together for many years but had recently separated. Father filed a motion for summary judgment requesting the court to dispose of all claims related to marriage and to declare that the parties were never formally or informally married. Mother filed a motion for declaratory judgment, supported by her affidavit, requesting that the court determine that the parties are married under common law.

In January 2020, the trial court rendered agreed temporary orders appointing both parties temporary joint managing conservators, granting Father the exclusive right to designate Daughter's primary residence at the parties' family home, and specifying periods for Mother's

---

[1] According to the undisputed evidence at trial, after her release from Rock Springs Hospital, Mother left Father and moved to New York, where the parties met and where Mother's family lives.

possession and that such possession shall be exercised at the family home (while Father is gone) and be supervised by a member of Mother's family. The temporary orders also required Father to pay Mother monthly temporary support. In a March 19, 2020 order, the trial court granted Mother's motion for declaratory judgment, finding that the parties were common-law married in Texas as of January 1, 1998; denied Father's motion for summary judgment; and rendered further temporary orders permitting Mother to exercise her visitation periods within ten miles of the family home and, among other provisions, required Father to pay a portion of Mother's airfare and hotel expenses incurred to exercise her right to possession.

Trial to the bench occurred, virtually, July 12–15, 2021. Father and Mother each testified, relating vastly different accounts of the parties' relationship, assets, and financial information as well as of Mother's mental-health issues. Mother testified that she and Father started dating when she was about twenty and that Father's "general attitude towards women" is that "all women are stupid" and he "doesn't have very good respect for women." She described Father as very "controlling" of her whereabouts, her clothing and hairstyles, and her contact with friends, usually "chas[ing] them away." Mother did not have a driver's license, largely because Father convinced her that women were bad drivers and causing her to become too anxious to practice her driving or take the exam, and he did not allow her to ride on public buses because they were dirty or to take taxis because they were expensive. Mother therefore relied on Father for all her transportation needs. Mother testified that she felt "belittled, put down, [and] basically worthless" by the way Father treated her, which made her "question [her] own sanity." Mother admitted that she has seen many doctors and psychiatrists over the years to help with her mental health, but she explained that most of the time she "wasn't able to speak for" herself because

3

Father would "control the conversation" and tell the doctors what was wrong with her, and he often told her what to say.

Mother testified that she has been prescribed Risperdal since a 2008 hospitalization that was spurred, in part, by her lack of sleep for ten days and leaving the family home to stay in a hotel because she had received an anonymous call that Father was cheating on her. Mother testified that she takes two medications currently, Benztropine and Risperdal, and has been taking them for approximately the last two years. She explained that the Benztropine is used to "calm the effects" of the Risperdal, which—according to her New York healthcare providers—is used to help her sleep because she has a hard time sleeping. She testified that Father helped sneak her out of the hospital after her 2008 hospitalization.

Mother testified that at home, Father always "controlled everything," including administering her medicine, which he kept locked up in a safe and administered to her in the doses and at the times he saw fit, sometimes reducing her dosages or skipping them if he believed she didn't need them. Father also gave Mother very expensive jewelry as gifts on special occasions, and he required her to keep it locked up in a safe; she would have to ask him to take it out for her if she wanted to wear it. Mother testified to some physical abuse by Father, and she spoke about how Father slowly over time alienated her from her family. Mother explained that she has since learned in therapy that Father was "gaslighting" her—manipulating and controlling her, making her think that what she was saying was not true, and making her question her own sanity. Mother testified that Father had told her that he would "kill my nieces and nephews starting with the youngest one working the way up and all the way up to the oldest one."

4

Father testified that Mother has serious mental illness—she has been diagnosed with schizophrenia and bipolar disorder—describing two instances when Mother "vanished" from the family home without telling him or Daughter where she was for about a month. The first time was in 2015 or 2016, and the second time was recently after Mother was discharged from Rock Springs Hospital. When Mother "becomes psychotic," it's "like dealing with the exorcist or something" and is "so fatiguing that [Father doesn't] even know how to explain it." He does not sleep well, it's "terrible," he can't communicate with Mother, and her psychotic episodes have happened "a number of times." He is concerned about Mother having unsupervised possession of Daughter because Mother "can harm" her and "doesn't even know who she is when she has these breakdowns." Father would not be comfortable with Mother having unsupervised visitation even if the parties' parenting facilitator and Daughter's therapist agreed that it would be safe to do so because schizophrenia is a "long-term, lifelong illness" that can "strike any time," and it has struck even while Mother was "on her Risperdal."

The following additional witnesses testified: Lee Fox Marley, Daughter's therapist; Kathleen Bolger, Mother's psychiatric nurse practitioner in New York; Chad Angelotti, Mother's therapist in New York; Dr. Danae Rickenbacker, a psychiatrist who had four appointments with Mother between 2018 and 2019; Patrick Pidgeon and Brian Pidgeon, Mother's brothers; Colleen Erbe, Mother's sister; Patrick Dittrich, an automobile appraiser; John Izzo, Mother's attorney; Jeannie Sonnier, the parties' accountant; and Robert Steenrod, Father's father (Grandfather). Testimony of these witnesses will be recounted, as necessary, below in the discussion.

5

The trial court rendered a final divorce decree on July 22, 2022.[2] The decree appointed Mother and Father joint managing conservators of Daughter and gave Father the exclusive right, among other rights not at issue, to designate Daughter's primary residence within Travis County and contiguous counties or within Otsego County, New York, for as long as Mother resides in one of those counties. The decree denied Father's motion for the court to confer with Daughter, ordered Mother to pay Father $250 in monthly child support, imposed a standard possession order, awarded 55% of the community estate to Mother and 45% to Father, and confirmed specified items of personal property (e.g., jewelry items and keepsakes) as Mother's separate property. On Father's request, the trial court made findings of fact and conclusions of law and later issued corrected findings of fact and conclusions of law.

## DISCUSSION

*Conservatorship and related issues*

In his first issue, Father contends that the trial court abused its discretion in four ways: (1) designating Mother a joint managing conservator (rather than a possessory conservator), (2) ordering a residency restriction, (3) denying a permanent injunction preventing Mother from withdrawing Daughter from any school activity or the care of any person caring for her, and (4) denying Father's motion for the court to confer with Daughter.

When making determinations about conservatorship and possession of and access to a child, the best interest of the child shall always be the primary consideration of the court. *See* Tex. Fam. Code § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). Suits affecting the

---

[2] The July 22, 2022 decree is actually entitled, Amended Final Decree of Divorce, which granted the parties' joint motion to modify, correct, or reform the earlier-signed final divorce decree.

6

parent–child relationship are "intensely fact driven" and require courts to balance many factors. *Lenz*, 79 S.W.3d at 19. Trial courts have broad discretion to determine what is in a child's best interest. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.). The appointment of the parents as joint managing conservators is rebuttably presumed to be in the child's best interest, and both parents shall be appointed joint managing conservators unless the court finds that appointment of either parent would significantly impair the child's physical health or emotional development. *See* Tex. Fam. Code § 153.131; *see also id.* § 153.252 (establishing rebuttable presumption that standard possession order is in child's best interest). Further, trial courts have broad discretion in determining whether to specify a geographic limitation on a child's primary residence. *In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.).

The trial court is in the best position to observe the witnesses and "can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," and we will not disturb the trial court's order on appeal unless the complaining party establishes a clear abuse of discretion. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.); *see Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (trial court's determinations on conservatorship and child support are reviewed for abuse of discretion). To demonstrate an abuse of discretion, the appellant must show that the trial court acted in an arbitrary or unreasonable manner, or without regard to guiding principles of law. *Coleman*, 109 S.W.3d at 110.

In reviewing a trial court's decision, we should bear in mind that the trial court "is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the

claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). The mere fact that a trial court decided an issue in a manner differently from how an appellate court would under similar circumstances does not establish an abuse of discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).

Legal- and factual-sufficiency challenges are factors we consider in assessing whether the trial court abused its discretion rather than independent grounds of error. *Id.* at 587-88; *see In re J.R.D.*, 169 S.W.3d at 743. We ask first whether the court had sufficient information on which to exercise its discretion and secondly whether it erred in its application of that discretion. *Echols*, 85 S.W.3d at 477–78. "The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there." *Zeifman*, 212 S.W.3d at 588 (citing *Echols*, 85 S.W.3d at 478). The appellate court then determines whether, based on the evidence, the trial court made a reasonable decision, "that is, that the court's decision was neither arbitrary nor unreasonable." *Id.* A trial court does not abuse its discretion as long as some evidence of a probative nature exists to support the court's decision, *id.*, and we generally will not find an abuse of discretion when the trial court bases its decision on conflicting evidence, *see In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). When reviewing the evidence for factual sufficiency, we consider and weigh all the evidence presented and will set aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence that they are clearly wrong and unjust. *Zeifman*, 212 S.W.3d at 588-89.

In support of its conclusions that Father and Mother should be appointed joint managing conservators, that Mother should have possession of Daughter pursuant to a standard possession order, and that Father's right to designate Daughter's primary residence should be

subject to a geographic restriction, the trial court made the following fact findings. Father does not challenge the findings appearing below in bold print:[3]

- While the parties were living together, [Mother] was the primary caretaker of [Daughter];

- **[Mother] is actively participating in [Daughter's] therapy**;

- **[Mother] is having regular phone calls with [Daughter]**;

- **COVID-19 restrictions and finances impaired [Mother's] ability for in-person visits**;

- **[Mother], accompanied by her brother Brian, had a supervised visit with [Daughter] in March 2020**;[4]

- **[Mother] is attending therapy and taking prescribed medications**;

- **[Mother] desires a healthy relationship with [Daughter]**;

- No credible evidence was presented that [Mother] presently presents a danger to [Daughter];

- **No credible evidence was presented that either party had a history of neglect toward [Daughter]**.

Unchallenged fact findings are binding on an appellate court unless the contrary is established as a matter of law or no evidence supports the finding. *Hegar v. El Paso Elec. Co.*, 629 S.W.3d 518, 527 (Tex. App.—Austin 2021, pet. denied); *see also Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) ("We defer to unchallenged findings of fact

---

[3] The trial court's fact findings on this issue are non-exhaustive, as indicated by the court's recital preceding the listing of findings: "The following facts (among others) support [the court's conservatorship and possessory determinations]."

[4] In his brief, Father takes issue with the former version of this fact finding—which included the additional phrase that "Daughter had a great time"—rather than with the trial court's corrected fact findings, which do not include this challenged portion. His argument as to this fact finding is, thus, moot, and we do not address it.

that are supported by some evidence."). All the above unchallenged fact findings are supported by evidence in the record, and we do not further address them.

As to the challenged finding that Mother was Daughter's primary caretaker while the parties were living together, we conclude after reviewing the record that legally and factually sufficient evidence supports it. Father cites his testimony that he "consistently" had nannies in the home to care for Daughter and instructed the nannies, in accordance with the advice he received from two of Mother's doctors, that Mother was never to be left alone with Daughter. He also cites Grandfather's testimony that Father's role in the house while the parties lived together included "everything," such as shopping, cooking, and hiring nannies and housekeepers. In contrast, Mother testified that she "basically" raised Daughter from the time she was young, that she has indeed been alone with Daughter, and that nannies have helped her in caring for Daughter while Mother worked doing the "paperwork" for the parties' HVAC business (which the parties started together during the marriage). She also testified that when she first attempted to divorce Father, in 2016, Father convinced her to "come back into the house to help take care of" Daughter. The evidence therefore was disputed as to who was Daughter's primary caretaker, and we cannot conclude that the trial court's finding of fact is not supported by legally and factually sufficient probative evidence.

As to the challenged finding that there was no credible evidence that Mother currently presents a danger to Daughter, Father cites Mother's testimony that, even though she has consistently been prescribed Risperdal since 2008, she has "gone off it" several times. However, Mother further testified that Father locked her medications up in a safe and controlled the doses and times that he administered them to her, sometimes telling her that she did not need the medicine or could lower her dosage. She testified that, as to her medications, she previously

just did whatever Father "told her to do." Mother and Bolger—the nurse practitioner Mother has been seeing since her discharge from the New York hospital—testified that since that hospitalization, Mother has cooperated with Bolger's recommendations about medications and dosages, has taken her medication consistently as prescribed, and has attended every scheduled appointment with Bolger as well as with Angelotti. The trial court could have found credible Mother's testimony explaining her previous noncompliance with taking her prescribed medications as being due to Father's extreme level of control over her. Although Mother admitted a 2019 decision of her own not to follow her doctor's orders regarding prescribed medications, the trial court could reasonably have attributed less weight to that decision—made just after Mother had successfully extricated herself from her relationship with Father and while faced with making a new life for herself in New York—than to the nearly two years of compliance with her providers' recommendations and positive progress since then. Additionally, evidence showed that Bolger and Angelotti regularly communicate to coordinate Mother's recovery and care. Angelotti testified that he has no concerns about Mother's ability to adhere to her medication prescriptions or stay healthy and did not think she poses any danger to Daughter. Mother's sister testified that Mother has exhibited increased confidence and independent decision-making abilities since leaving Father.

Furthermore, no conclusive evidence showed that Mother had ever endangered Daughter physically. Although some evidence showed that Mother had caused emotional harm or trauma to Daughter in the past—through her twice temporarily abandoning Daughter by abruptly leaving the family home without communicating her whereabouts to Father or Daughter for a time and having episodes of psychosis in Daughter's presence—the trial court could reasonably have found that further risk of such harm had sufficiently diminished by virtue of

11

Mother's living in New York, where she has family support, rather than with Father, and by virtue of Mother's mental stability during the nearly two years preceding trial. Although Father cites his testimony about a bathtub "incident" involving Mother's allegedly almost causing then four-year-old Daughter to drown, Father's testimony about the incident was equivocal, and Mother explained that she had simply been trying to get Daughter to sit down in the bathtub and allow her to wash her hair, causing Daughter distress but no harm or danger.

Father also cites the testimony of Daughter's therapist, Marley, that Father's fears and apprehension regarding Mother's having unsupervised visitation with Daughter are reasonable and normal and that she would think it unusual if he did not feel that way. When asked whether she believed Daughter would be unsafe with Mother, Marley responded that it is an "unknown" but also stated that Mother has had some "serious mental illness episodes that have occurred that would put [Daughter] at risk." However, again, Marley's testimony was based on Father's past with Mother and his having witnessed some of Mother's serious mental-illness episodes. The trial court could reasonably have determined that Father's apprehension about Mother's having unsupervised visitation with Daughter and Marley's agreement that such feelings are normal considering Mother's mental-health history and the parties' fraught relationship do not necessarily compel a finding that Mother presents a *current* danger to Daughter. We conclude that the trial court did not abuse its discretion in finding that Mother does not currently present a danger to Daughter and in appointing Mother a joint managing conservator.

We next address Father's complaint that the trial court abused its discretion in denying his requested permanent injunction. Although the Family Code does not expressly address the situations in which a trial court may issue a permanent injunction in a SAPCR

12

proceeding, it is well-established that the trial court may do so when it is in the child's best interest. *Gerges v. Gerges*, 601 S.W.3d 46, 61 (Tex. App.—El Paso 2020, no pet.); *see Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied); *see also* Tex. Fam. Code § 153.193 (authorizing trial court to impose "restrictions or limitations on a parent's right to possession of or access to a child" that do "not exceed those that are required to protect the best interest of the child"). The general standards applicable to permanent injunctions in civil cases (i.e., a wrongful act, imminent harm, irreparable injury, and no adequate remedy) do not apply in family-law cases, and the trial court has the discretion to impose restrictions on parents it determines are in the children's best interest. *See Peck*, 172 S.W.3d at 35; *see also Messier v. Messier*, 389 S.W.3d 904, 908 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("[C]ourts routinely grant permanent injunctions" in child custody cases "consistent with the best interests of the children."). As with any other finding relating to a child's best interest, we review the trial court's decision whether to impose a permanent injunction regulating a parent's conduct for an abuse of discretion. *See Gerges*, 601 S.W.3d at 61.

Having reviewed the record, including the trial court's unchallenged fact findings and the challenged findings we have determined are supported by legally and factually sufficient evidence, we cannot conclude that the trial court abused its discretion in failing to issue a permanent injunction prohibiting Mother from withdrawing Daughter from any school activity or from the care of any person caring for Daughter. Although the trial court issued an ex parte temporary restraining order prohibiting Mother from withdrawing Daughter from school or hiding Daughter from Father early in the pendency of this case, such order was based entirely on Father's affidavit. After hearing the parties' and other witnesses' testimony at trial, the trial court determined that Father's requested restrictions were not necessary and therefore did not

13

issue a permanent injunction. The only evidence Father cites to support his argument that the trial court abused its discretion in refusing the injunction is his testimony in which he expresses his belief that Mother poses a danger to Daughter if left alone with her because of Mother's extensive mental-health issues. But, as we have already discussed, the trial court was free to weigh contradictory evidence in Mother's favor considering its overarching mandate to render orders in Daughter's best interest without imposing restrictions greater than necessary to achieve that end.

As to Father's complaint about the trial court denying his motion for the court to confer with Daughter, the Family Code grants the trial court discretion to determine whether interviewing a child under age twelve should occur. *See* Tex. Fam. Code § 153.009(a), (b). The statute permits the court to interview children younger than twelve but does not require it and places no conditions on the court's not exercising that option. *See id.*; *Wiegman v. Wiegman*, No. 03-05-00025-CV, 2006 WL 305272, at *2 (Tex. App.—Austin Feb. 10, 2006, no pet.) (mem. op.) (holding no abuse of discretion where trial court failed to interview child under twelve). The trial court had ample evidence, including the testimony of Daughter's therapist, from which it could reasonably exercise its broad discretion about what would be in Daughter's best interest in terms of conservatorship and possession. The record does not demonstrate that the trial court acted unreasonably, arbitrarily, or without regard for guiding rules or principles by not interviewing Daughter in chambers. Accordingly, the trial court did not abuse its discretion with regard to Father's four complaints, and we overrule Father's first issue.

In his second issue, Father argues that the trial court abused its discretion in denying his request that Mother have only supervised visitation with Daughter and in denying a finding that awarding Mother unsupervised access to Daughter would endanger Daughter's

14

physical health or emotional welfare or would otherwise not be in Daughter's best interest. A trial court's order restricting a parent's right to possession of or access to a child may not impose restrictions beyond those required to protect the child's best interest. *See* Tex. Fam. Code § 153.193; *In re Marriage of Harrison*, 557 S.W.3d 99, 131 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

To support this issue, Father cites the following evidence: Marley's testimony that Daughter harbored a lot of anger towards Mother because she had left Daughter twice for long periods with no goodbye or explanation; Marley's testimony that Daughter had been "traumatized" by witnessing Mother's "psychotic episodes"; Marley's opinion that Mother should have supervised visitation initially with Daughter so that Daughter will have a sense of security during visits; Marley's opinion that due to Mother's history of serious mental-health episodes, Daughter's safety with Mother currently is an "unknown"; Father's testimony that Mother's prior treating physicians cautioned him that Mother should never be left alone and unsupervised with Daughter due to Mother's psychiatric conditions; Father's testimony that he consistently maintained nannies to care for Daughter while Mother was at home and he was at work; and Father's testimony about the bathtub "incident."

In contrast to the foregoing evidence, the court heard evidence about a March 2020 visitation between Mother and Daughter, supervised by Mother's brother (Uncle), that had gone well and at which Daughter had a "great time," according to Mother's and Uncle's testimony. Although Marley testified that Daughter had some discomfort about the visitation, the discomfort was because Uncle was a smoker and Daughter was concerned that Uncle and Mother might have broken the rule about supervised visitation when Uncle stepped outside to smoke. Additionally, the testimony of Mother's two current providers, Bolger and Angelotti,

supports the trial court's finding that supervised visitation is not currently necessary because Mother is consistently taking her prescribed medications and is doing well and has been for nearly the past two years. Specifically, Bolger testified that over the two years before trial, Mother's dosage of Risperdal had been reduced from three milligrams, twice per day, to one milligram per day. Bolger testified that Mother was "very stable" emotionally when Bolger began treating her and that Mother is not a danger to anyone. She testified that post-traumatic stress disorder (PTSD) and bipolar disorder have many similar symptoms; that if medications are misused or are combined with severe abuse, other diagnoses can mimic schizophrenia and bipolar disorder; and that reactions from severe abuse are associated with PTSD and depression.

Angelotti testified that Mother's symptoms were more consistent with PTSD than with bipolar or schizophrenia, and he believed that Mother was suffering from PTSD resulting from her abusive relationship with Father. Angelotti had never witnessed any manic behavior from Mother, even though mania is a "hallmark symptom" of bipolar disorder, and he had seen no other indications of bipolar disorder or schizophrenia. Mother had related to him in detail a night when she awoke to find that Father had barricaded the door to her upstairs bedroom, and he believed that Mother's mental-health difficulties were all "trauma-related," the trauma being the emotional abuse she suffered by Father. Angelotti testified that he has no concerns that Mother is a danger to Daughter, although he believes that the mother–daughter relationship needs repair and that Daughter blames Mother for their strained relationship.

Apart from the disputed and vague testimony about the bathtub "incident," Father points to no other evidence showing that Mother put Daughter's physical safety or well-being at risk. Further, on this record, the trial court could have determined that any emotional and mental trauma that Daughter has suffered, as described by Marley, stemmed primarily from Mother's

16

unmanaged mental-health issues (which are being managed now, without Father's influence) and from Mother's being in an extremely controlling relationship with Father. Marley additionally testified that everything she has seen about Mother's parenting indicates that she has been "a great mom." Although Marley had recommended that Mother's visitation, initially, be supervised, this recommendation was based primarily on her concern that Mother might have psychotic episodes in front of Daughter. Marley explained that when Mother's risk of having such episodes had decreased, unsupervised visitation would be appropriate. As already noted, Mother's current providers testified that she has been stable and is doing well. We cannot conclude that the trial court did not have sufficient information upon which to exercise its discretion or that it reached an unreasonable or arbitrary result after considering the evidence in the record, especially considering the trial court's exclusive province to resolve underlying facts and make credibility determinations. *See Allen v. Allen*, 475 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.). We overrule Father's second issue.

### *Property division*

In his third issue, Father contends that the trial court abused its discretion by making a "manifestly unjust and unfair property division." He argues that the trial court unfairly awarded 55% of the community estate to Mother, erred in the valuation of the parties' HVAC business, and mischaracterized an investment account as community property. The Family Code requires the court to make a "just and right" division of the marital estate in a divorce. *See* Tex. Fam. Code § 7.001. The trial court is not required to divide the community estate equally, but its division must be equitable, with some reasonable basis for an unequal division. *See Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). As long as there is a reasonable basis for an

17

unequal division of the property in the record, the trial court has not abused its discretion. *See id.* The party challenging the property division must show from the record that the division was so disproportionate, and thus unjust and unfair, that it constitutes an abuse of the trial court's discretion. *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 836 (Tex. App.—Texarkana 1996, writ denied). Reviewing courts apply a two-pronged analysis to review the division: (1) whether the trial court had sufficient information on which to make its determination, and (2) whether the trial court abused its discretion by making a manifestly unjust or unfair property division. *Evans v. Evans*, 14 S.W.3d 343, 346 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

In exercising its discretion, the trial court "is empowered to use its legal knowledge and its human understanding and experience" and "has the opportunity to observe the parties on the witness stand, determine their credibility, [and] evaluate their needs and potentials, both social and economic." *Murff*, 615 S.W.2d at 698-99. The trial court may consider many factors, including the spouses' earning capacities, disparity of income and abilities, education, business opportunities, relative physical condition, relative financial condition, disparity of ages, size of separate estates, nature of the property, and the benefits that the spouse who did not cause the breakup of the marriage could have enjoyed had the marriage continued. *Id.* "The circumstances of each marriage dictate what factors should be considered in division of the marital estate." *Roberts v. Roberts*, 531 S.W.3d 224, 232 (Tex. App.—San Antonio 2017, pet. denied) (citing *Young v. Young*, 609 S.W.2d 758, 761 (Tex. 1980)).

As for the unequal division of property, the trial court identified four factors relevant to its determination: (1) Father's greater earning power, (2) Mother's need for financial support, (3) the parties' health, and (4) Father's sole management and control of income-producing assets during the pendency of the divorce proceedings. In our review of the record,

18

we have found evidence relevant to each of these factors, and we cannot say that the trial court reached a manifestly unjust or unfair property division based thereon.

For example, the trial court found, and Father does not challenge, that at the time of trial Mother's monthly net resources were $481.46 while Father's were $6,638.00. This finding supports an unequal division, as does Mother's testimony that she is currently working part-time and grossing $560 per month. Nonetheless, Father contends that no evidence supports the trial court's finding that Mother is not "under-employed because [she] is unable to work more hours due to medical issues," citing (1) his testimony that Mother has "one or two degrees" including business management or accounting and (2) Mother's testimony that she worked during the marriage doing the "paperwork" for the parties' HVAC business. However, those facts are not inconsistent with the trial court's finding. Mother testified that her work for the HVAC business primarily involved handling payroll; paying bills, sales taxes, and estimated taxes; and checking inventory as it was delivered. In the early days of the business, she also handled phone calls and dispatching, but Father "stopped making [her] responsible for all this stuff because it was too much." She and Father would pay themselves salaries from the business towards the end of each year when they figured out how much they could get paid, usually between $60,000 and $100,000 each. Besides this evidence of Mother's education and work experience during marriage, extensive evidence was presented regarding Mother's mental-health diagnoses and conditions and how those affect her ability to function under stress, and Mother testified that she has been struggling greatly with missing Daughter and still has nightmares, which the trial court could reasonably have concluded affect her ability to stay healthy, keep her medical and therapy appointments, and work full-time. Considering the entire record, the trial court could have (a) reasoned that Mother's mental-health conditions and distance from

19

Daughter currently prevent her from taking on a greater workload, (b) afforded less weight to the factor of each party's earning potential than to other factors, or (c) concluded that Father's earning potential as a licensed HVAC technician owning an established company is greater than Mother's, even with her experience doing the "paperwork" for the parties' HVAC business.

Regarding the parties' respective health, evidence was presented about Mother's serious mental-health challenges, diagnoses, and difficulty sleeping and about Father's physical ailments from back injuries that he sustained in his twenties that have been worsening in recent years. Although testimony showed that Father's physical ailments require him to stop performing the physical work of the HVAC business, he nonetheless possesses an HVAC license and—as Mother testified—could hire additional employees to do the work that he is no longer physically able to do himself, similar to how he has employed technicians in the past. Mother testified about Father's sole access to and control over the marital assets while the divorce was pending—which evidence was undisputed—and about several assets that existed when she left Father but which Father has denied ever existed or still exist. Some of those missing assets include collections of stamps, gold, and silver; guns; tractors and similar heavy equipment; trailers; an all-terrain vehicle; a food truck; and trailers. Mother testified that she needed to rely on financial support from her family during pendency of the divorce because Father had control of the community accounts and liquidated them while they were separated. In light of this and other evidence, we cannot say that the trial court abused its discretion in unequally dividing the property.

As to Father's contention that the trial court overvalued the HVAC business in making its property division, Father points to his testimony about the value of the business's assets, including its inventory, equipment, and tools; its declining income due primarily to his

20

worsening health conditions; its lack of any "good will value" because a person cannot perform air-conditioning or refrigeration repair services without a master license, which is non-transferrable; and its debt of over $54,000, rendering a "negative value" for the company. Father contends that the trial court overvalued the company as an asset—at $137,000—"when it is only debt," resulting in an unjust and inequitable division of the community estate by awarding the company to him as part of his 45%. However, as with our conclusion about the unequal property division, we similarly conclude that credible evidence supports the trial court's valuation.

Mother testified that the business had inventory worth about $250,000 when she left Father in 2019, and she listed several items that the business kept in inventory. She also testified that, in addition to the business's inventory, she believed the value of the business equipment (including several items of heavy machinery such as excavators) to be about $250,000 and the value of the business's trade name and goodwill to be about $10,000. Father testified conversely, as summarized above. Additionally, the parties' accountant who prepared their personal and business tax returns each year since 2007, Jeannie Sonnier, testified. Sonnier estimated that the company's 2020 income was about $146,000, although she had not yet completed that year's tax return. She explained that its income in 2019 was $237,000 and in 2018 it was $326,000. She testified that the business's income had steadily declined since 2016, when it was about $650,000.

The record reflects that the trial court took into account several factors, as reflected by these three witnesses' differing testimonies, when determining a value for the business: Sonnier's testimony reflecting the steady decline in business income; Father's testimony about his physical limitations as he has aged and how that has contributed to the decline of the business, as well as the business debt and his estimated value of inventory and

21

equipment; and Mother's testimony about her estimated value of the inventory and equipment, including her descriptions of several individual items of heavy equipment, as well as her testimony about the business's goodwill and Father's ability to hire more technicians to keep the business profitable. We cannot say that, based on this record, that the trial court abused its discretion in valuing the HVAC business at $137,000.

As to Father's complaint that the trial court improperly mischaracterized an investment account (which the parties refer to as the Macquarie 401k account) as community property instead of his separate property, we conclude that the record supports the trial court's finding that Father failed to meet his burden of proof on the issue. *See Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *5 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.) (noting that party claiming certain property as separate has burden of rebutting community-property presumption); *see also* Tex. Fam. Code § 3.003(a) (specifying that property possessed by either spouse during or on dissolution of marriage is presumed to be community). Meeting the burden of proof that property is separate requires tracing and clearly identifying the property in question as separate by clear and convincing evidence. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011); *see* Tex. Fam. Code § 3.003(b) ("The degree of proof necessary to establish that property is separate property is clear and convincing evidence."). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Ganesan*, 96 S.W.3d at 354.

22

The party attempting to prove that property is separate must present evidence showing the account balance when the separate property is deposited, the amount and character of withdrawals and deposits, and whether the balance during marriage ever fell below the value of the separate-property interest. *See Goyal*, 2021 WL 2149628, at \*16. Additionally, as the party appealing a negative fact finding on an issue upon which he bore the burden of proof, Father must demonstrate that the evidence conclusively establishes that the funds in the account are his separate property and that no reasonable factfinder could have arrived at the conclusion the trial court reached here. *See Lecuona v. Lecuona*, No. 03-17-00138-CV, 2018 WL 2994587, at \*2 & n.13 (Tex. App.—Austin June 15, 2018, pet. denied) (mem. op.); *Herbert v. Herbert*, 774 S.W.2d 1, 3 (Tex. App.—Fort Worth 1998, pet. denied).

Mere testimony that property was purchased with separate funds, without tracing of the funds, is generally insufficient to rebut the community-property presumption. *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, pet. denied). When the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community-property presumption prevails. *See McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973); *Rivera v. Hernandez*, 441 S.W.3d 413, 423 (Tex. App.—El Paso 2014, pet. denied) (noting that party may plead that brokerage account is separate property, "but income earned and dividends paid—if not clearly traced—will result in characterization of the account as community property due to commingling"). Gaps in account statements can make tracing evidence less than "clear and convincing." *See Goyal*, 2021 WL 2149628, at \*9 (concluding that three-month gap in account statements was less than clear and convincing evidence to support separate-property claim, especially considering high growth of account during that period); *In re Everse*, 440 S.W.3d 749, 752 (Tex. App.—Amarillo 2013, no

23

pet.) (noting that tracing evidence included gap between account statements for November 1999 and September 2010 and concluding that trial court did not err by finding husband's tracing evidence "to be less than the clear and convincing evidence required"). Additionally, courts resolve any doubt as to the character of property in favor of community status. *See Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.).

Father did not provide documentary evidence demonstrating the value of the Macquarie account on the date of marriage or tracing its contents since. *See Eichorn v. Eichorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *3 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.). He supported his claim, instead, with his testimony about opening the account when he was around ten to twelve years old, but testimony alone is often not enough. *See id.* Although it is undisputed that Father opened and established the disputed Macquarie account when he was a young child, there was no evidence about the value of the account on the date of marriage, and no tracing of any funds into or out of it since marriage. The account was valued at about $125,000 on the date of divorce, but the trial court was within its discretion to conclude that Father failed to present clear and convincing evidence establishing which portion of the account was his separate property, especially considering that any income from the account that accrued during marriage is community property. *See, e.g.*, *Mason v. Mason*, No. 03-17-00546-CV, 2019 WL 1967166, at *3 n.3 (Tex. App.—Austin May 3, 2019, no pet.) (mem. op.) ("[R]evenue and income gained during the marriage, even when produced from separate property, are generally considered community property."). We accordingly overrule Father's third issue.

**CONCLUSION**

Having overruled Father's issues, we affirm the trial court's divorce decree.

_____

Thomas J. Baker, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed:   July 25, 2024